UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Adam Saul Futo and James Bartley Ellis, *individually and on behalf of all others similarly situated*,

        Plaintiffs,

v.

U.S. Bancorp and U.S. Bancorp Investments, Inc.,

        Defendants.

File No. 25-cv-1464 (ECT/DJF)

**OPINION AND ORDER**

---

Jonathan F. Neumann, Joseph H. Meltzer, Melissa L. Yeates, and Tyler Graden, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Catherine Sung-Yun K. Smith, Daniel E. Gustafson, and Shashi K. Gowda, Gustafson Gluek PLLC, Minneapolis, MN; and James E. Cecchi and Kevin G. Cooper, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, for Plaintiffs Adam Saul Futo and James Bartley Ellis.

David L. Goldberg, Katten Muchin Rosenman LLP, New York, NY; Anna Porter, Michael Joseph Beirne, and Peter Ginewicz Wilson, Katten Muchin Rosenman LLP, Chicago IL; and Anderson Tuggle and Larry E. LaTarte, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, for Defendants U.S. Bancorp and U.S. Bancorp Investments, Inc.

---

Defendants U.S. Bancorp and U.S. Bancorp Investments, Inc., provide a bank-deposit (or "cash-sweep") program for investment-account customers. Under the program, uninvested cash balances in participating customers' accounts are periodically transferred (or swept) into interest-bearing deposit accounts, and customers are paid interest.

Plaintiffs Adam Saul Futo and James Bartley Ellis are two investment-account customers who participated in Defendants' cash-sweep program. In this would-be class action, Mr. Futo and Mr. Ellis allege that Defendants paid them and all other participating customers unreasonably low, below-market interest rates. Plaintiffs invoke subject-matter jurisdiction under CAFA and assert several claims arising under state law.

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6). The motion will be granted. To summarize, Minnesota's independent-duty rule bars Plaintiffs' negligence claim. Plaintiffs do not allege facts plausibly showing a fiduciary relationship; if they did, they do not allege facts plausibly showing a fiduciary duty was breached. Nor do Plaintiffs plausibly allege that the implied covenant of good faith and fair dealing was breached. Plaintiffs' misrepresentation and fraud claims—whether they are common-law or statutory claims—fail for overlapping reasons. The primary dismissal-prompting problem is that Defendants fully disclosed the program's interest-payment arrangement and did not commit to paying a "reasonable" or minimum interest rate. The unjust-enrichment claim fails because a contract covers the complained-of behavior and Plaintiffs have not plausibly alleged the contract might be unenforceable. For legal and practical reasons, Plaintiffs will not be given an opportunity to amend, and the operative Amended Complaint will be dismissed with prejudice.

I

Before turning to the facts, two preliminary issues deserve explanation. The first is subject-matter jurisdiction. Plaintiffs filed this case here, invoking subject-matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).

CAFA's jurisdictional prerequisites are clear. "CAFA gives federal courts jurisdiction over certain class actions, defined in § 1332(d)(1), if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 84–85 (2014) (citing 28 U.S.C. § 1332(d)(2), (5)(B)). The task of determining whether a case meets CAFA's $5 million threshold is not intended to be difficult. "[T]he claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(6). CAFA "tells the District Court to . . . add[] up the value of the claim of each person who falls within the definition of [the] proposed class and determine whether the resulting sum exceeds $5 million." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013); *accord Faltermeier v. FCA US LLC*, 899 F.3d 617, 621 (8th Cir. 2018) ("A district court aggregates the claims of all named or unnamed persons who fall within the definition of the *proposed* or certified class." (citation modified)).

Here, no party questioned CAFA jurisdiction's presence, but after reading Plaintiffs' original Complaint, I thought there was a problem. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (observing that a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"). The original Complaint alleged facts plausibly showing that the proposed class has more than 100 members, *see* Compl. [ECF No. 1] ¶ 90, and that there is minimal diversity between Plaintiffs and Defendants, *see id.* ¶¶ 11, 13, 15–16, but it alleged nothing discernable regarding the value of each proposed class member's claim,

*see id.*  For this reason, Plaintiffs were given the chance to file an amended pleading with its changes limited to addressing CAFA's jurisdictional prerequisites, particularly the statute's $5 million amount-in-controversy threshold.

In their now-operative Amended Complaint, Plaintiffs allege facts plausibly showing that the aggregate value of would-be class members' claims exceeds CAFA's $5 million jurisdiction threshold.  *See* Am. Compl. [ECF No. 52] ¶¶ 8–9.  Plaintiffs start by alleging (1) the average monthly cash amount "swept" by U.S. Bank affiliates, including U.S. Bancorp Investments, Inc. (or "USBI"), between June 2022 and February 2025 ($1.9 billion), and (2) the average difference between the interest rates at which customers were paid (0.30% to 2.00%) and the average monthly effective federal funds rate (1.19% to 5.33%), a difference Plaintiffs allege is just one way (among perhaps many others) to calculate damages.  *Id.* ¶ 8.  Plaintiffs then allege:

> On information and belief, all of the roughly $1.9 billion per month swept to U.S. Bank by its affiliates came from accounts held by class members.  Using the aforementioned formula, if each class member received the maximum interest rate offered by USBI (between 0.30% and 2.00%), average aggregate monthly damages total greater than $4 million for each month between June 2022 and February 2025, and aggregate total damages exceed $140 million.  Even assuming that only half of the affiliate sweep deposits (roughly $1 billion per month) came from accounts held by class members, and that each class member received the maximum interest rate offered by USBI (between 0.30% and 2.00%), average aggregate monthly damages total greater than $2 million per month between June 2022 and February 2025, and aggregate total damages exceed $70 million.

*Id.* ¶ 9.  Whether my original concern was justified (or not), these allegations are enough to resolve the CAFA subject-matter-jurisdiction question at this stage.

II

The second preliminary issue concerns the universe of factual sources that may be considered in adjudicating Defendants' Rule 12(b)(6) motion. The general rule is that the facts are taken from the complaint, and all reasonable inferences are drawn in a plaintiff's favor. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, Fed. R. Civ. P. 12(d), but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Enervations, Inc. v. Minn. Min. & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)). "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Id.* (citation modified). Courts "additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (citation modified); *see Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

Defendants submitted four exhibits in support of their motion, and Plaintiffs agree these exhibits may be considered in adjudicating the motion. Tr. at 9. The exhibits include: (1) "Self-Directed Brokerage Applications" signed by Mr. Futo and accompanying agreements and disclosures. ECF No. 35 ¶ 3; ECF No. 35-1. (2) A "Self-Directed Brokerage Application" signed by Mr. Ellis and accompanying agreements and

disclosures.  ECF No. 35 ¶ 4; ECF No. 35-2; (3) A document entitled "Sweep Program Disclosure Statement," updated January 2024.  ECF No. 35 ¶ 5; ECF No. 35-3.  (4) A document entitled "Guide to Brokerage Recommendations: A Best Interest Disclosure," dated April 5, 2024.  ECF No. 35 ¶ 6; ECF No. 35-4.  Plaintiffs' concession that these documents may be considered is justified.  The first two document sets are integral to Plaintiffs' claims because they comprise the contracts between Plaintiffs and USBI. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing depends on the contracts' existence, and other claims are grounded on the contracts' content (or lack of content).  The third and fourth documents' contents are alleged in the Amended Complaint, and Plaintiffs do not dispute their authenticity.  *See* Am. Compl. ¶¶ 28 n.4, 40 n.12, 54 n.16, 86 n.26, 88 n.27.  The consequence is that the facts described in the next section are drawn from the operative Amended Complaint and these four exhibits.

III

U.S. Bancorp provides a full range of financial services and serves millions of customers.  Am. Compl. ¶ 20.  USBI is U.S. Bancorp's broker-dealer subsidiary. *Id.* ¶¶ 18, 21.  USBI offers investment-related products and services to retail customers in the United States, including a "number of brokerage account types."  *Id.* ¶ 21–22.  USBI's brokerage accounts "are securities accounts that allow customers to trade mutual funds, stocks, and other securities."  *Id.* ¶ 22.  "In connection with each of these accounts, customers enter into account agreements with USBI."  *Id.* ¶ 22.  Like USBI, non-party U.S. Bank also is a U.S. Bancorp subsidiary.  *Id.* ¶ 19.

Mr. Futo and Mr. Ellis each had brokerage accounts with USBI.  Mr. Futo opened an individual-retirement account (or "IRA") in 2016.  *Id.* ¶ 13; *see* ECF No. 35-1 at 2, 18.[1] Mr. Ellis opened a brokerage account in 2022.  Am. Compl. ¶ 15; ECF No. 35-2 at 2.  To open their accounts, Mr. Futo and Mr. Ellis each completed and signed a Self-Directed Brokerage Application.  ECF No. 35-1 at 2–5, 18–21; ECF No. 35-2 at 2–7.  Mr. Futo and Mr. Ellis's applications included a "Universal Customer Agreement" and other documents comprising a contract between each of them and USBI.  *See* ECF No. 35-1 at 6–12, 21; ECF No. 35-2 at 12–19, 23–30.

As part of their account applications, Mr. Futo and Mr. Ellis elected to participate in USBI's cash-sweep program.  *See* ECF No. 35-1 at 5, 8; ECF No. 35-2 at 7, 14.  With respect to Mr. Futo and Mr. Ellis's brokerage accounts, the agreements and related documents also refer to the cash-sweep program as the "Bank Deposit Program."  *See* ECF No. 35-2 at 25; ECF No. 35-3 at 2.  Under this program, USBI "continuously transfers uninvested cash balances in customers' brokerage accounts into interest-bearing deposit accounts at U.S. Bank."  Am. Compl. ¶ 26; *see id.* ¶ 24 (describing cash-sweep program as a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product . . . or an account at a bank whose deposits are ensured by the Federal Deposit Insurance Corporation" (quoting 17 C.F.R. § 240.15c3-3(a)(17)

---

[1]    Filed documents, including the four filed exhibits and the parties' briefs, will be cited by reference to pagination assigned by the court's CM/ECF system appearing in a document's upper right corner, not to a document's original pagination.

(2025))).  Under the program, "interest compounds daily on customers' cash, and USBI pays interest to customers monthly."  *Id.* ¶ 30.

In their applications, Mr. Futo and Mr. Ellis acknowledged they had received, read, and understood disclosures regarding USBI's cash-sweep program.  *See* ECF No. 35-1 at 5; ECF No. 35-2 at 7; *see* Am. Compl. ¶¶ 13, 15 (alleging that Mr. Futo and Mr. Ellis each "reviewed the agreements and disclosures pertaining to his account that were in effect" at the time).  Among other information, these disclosures described how the program worked. ECF No. 35-1 at 12; ECF No. 35-2 at 25.  They informed Mr. Futo and Mr. Ellis of their option not to participate in the program and to invest their accounts' cash balances in products offered outside the program.  ECF No. 35-1 at 12; ECF No. 35-2 at 25.  They explained that USBI received fees and benefits from the cash-sweep program.  ECF No. 35-1 at 12; ECF No. 35-2 at 27.  And the disclosures addressed the program's potential risks and benefits.  The disclosures Mr. Futo received explained, for example, that the cash-sweep vehicle—that is, the product into which available cash was swept—"should not be viewed as a long-term investment option" and that, money market funds carried "investment risk including the possible loss of the principal amount invested." ECF No. 35-1 at 12.  The disclosures Mr. Ellis received warned that the interest rate available through the cash-sweep program "may be higher or lower than the interest rates available" through other investment vehicles, and that "USBI has no obligation to ensure you receive a particular rate or the highest rate available."  ECF No. 35-2 at 26.  USBI's Sweep Program Disclosure Statement provided similar information.  *See, e.g.,*

ECF No. 35-3 at 3 (disclosing that USBI "has no obligation to ensure you receive a particular rate [of interest] or the highest rate available").

The interest rates USBI paid or secured on its customers' behalf, including Mr. Futo and Mr. Ellis, were low in comparison to rates offered through cash-sweep programs at other financial institutions and in relation to other benchmarks identified in the Amended Complaint. *See* Am. Compl. ¶¶ 1, 3–5, 14, 16, 59–71. For example, as of April 10, 2025, USBI's cash-sweep program paid interest at rates ranging from 0.23% to 1.80%, depending on a customer's cash balance. *Id.* ¶ 60. At that same time, by comparison, financial-services firms Vanguard and Fidelity offered higher cash-sweep-program interest rates—3.65% for Vanguard, and 3.97% for Fidelity. *Id.* ¶ 65. The USBI cash-sweep-program rates were also low in comparison to U.S. Treasury bills and the Federal Reserve's federal funds rates. From June 2022 through April 2025 (the month this case was filed), the USBI cash-sweep program paid interest at rates on cash deposits ranging from 0.07% to 2.0%. *See id.* ¶¶ 14, 16, 60–61, 70. During that same period, "the 1-Month U.S. Treasury Rate reached over 5%," *id.* ¶ 70, and the federal funds rate "increased significantly from a low of 0.08% to a high of 5.33% in 2024," *id.* ¶ 71.

Plaintiffs assert seven claims in their Amended Complaint. (1) Plaintiffs claim USBI breached a fiduciary duty it owed Plaintiffs and would-be class members "when it . . . allocated [their] cash into deposit accounts that benefited Defendants' interests above their customers' interests," and when it "set and paid an unreasonably low rate of interest on … cash balances" in the USBI cash-sweep program. Am. Compl. ¶¶ 105–114 (Count I). (2) Plaintiffs claim USBI was negligent in undertaking these same activities. *Id.* ¶¶ 115–

122 (Count II).  (3) Plaintiffs claim USBI breached the implied covenant of good faith and fair dealing by failing to pay its customers who participated in the cash-sweep program "a reasonable rate of interest." *Id.* ¶¶ 123–130 (Count III).  (4) Plaintiffs claim USBI negligently misrepresented and omitted "material information" regarding the cash-sweep program. *Id.* ¶¶ 131–139 (Count IV).  (5) Plaintiffs claim U.S. Bancorp and USBI violated the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, by "designing, structuring, and/or operating the [cash-sweep program] to benefit themselves at the expense of their customers," and by "making material misrepresentations and omissions regarding the" cash-sweep program. Am. Compl. ¶¶ 140–146 (Count V).  (6) Plaintiffs claim that, through these same activities, U.S. Bancorp and USBI violated the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44.  Am. Compl. ¶¶ 147–150 (Count VI).  (7) Plaintiffs claim that U.S. Bancorp and USBI "were unjustly enriched because, among other benefits, they received significantly greater net interest income than they would have but for their wrongful conduct." *Id.* ¶¶ 151–157 (Count VII).  Though Plaintiffs do not identify the source of their common-law claims in the Amended Complaint, Plaintiffs made clear in their briefing that Minnesota law governs those claims. *See* ECF No. 44 at 23–31.

## IV

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog*, 760 F.3d at 792.  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state

a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*; *see Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) ("Courts must not presume the truth of legal conclusions couched as factual allegations." (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

A

Before challenging each of Plaintiffs' claims one-at-a-time, Defendants advance a broader contention—they argue that Minnesota's independent-duty rule bars Plaintiffs' "tort claims." *See* ECF No. 34 at 15–16; ECF No. 46 at 9–10. Defendants do not specify which claims are "tort claims" subject to this challenge. To be clear, I understand Defendants' "tort claims" reference to mean every claim Plaintiffs assert except their claim for breach of the implied covenant of good faith and fair dealing, a claim that is by nature contractual, *see Selective Ins. Co. of S.C. v. Sela*, 413 F. Supp. 3d 861, 862–63 (D. Minn. 2019), and their unjust-enrichment claim, which is by nature equitable, *see United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013). Though it seems reasonable to question whether Defendants rely on the independent-duty rule to challenge Plaintiffs' claims under the Minnesota Consumer Fraud Act and the Minnesota Deceptive Trade Practices Act, claims like these are often referred to as "statutory torts." *See Ansari v. NCS Pearson, Inc.*, No 08-cv-5351 (JRT/JJG), 2009 WL 10678873, at *2 (D. Minn. Mar. 30, 2009); *see also*

11

*In re: EpiPen Direct Purchaser Litig.*, No. 20-cv-0827 (ECT/JFD), 2023 WL 4104000, at *2 (D. Minn. June 21, 2023).   For this reason, the safer course is to assume Defendants intend to challenge the statutory claims too.

Under Minnesota's independent-duty rule, "when a plaintiff seeks to recover damages for an alleged breach of contract[,] he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 125 (Minn. Ct. App. 2017) (citation modified); *accord Klucas v. M.H. Graff & Assocs.*, No. 20-cv-762 (SRN/TNL), 2020 WL 6275971, at *3 (D. Minn. Oct. 26, 2020).   "An independent tort may accompany a breach of contract when the defendant has a legal duty to the plaintiff arising separately from any duty imposed in the contract." *Staffing Specifix*, 896 N.W.2d 125–26 (quoting *Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 696 (Minn. Ct. App. 2015), *aff'd*, 886 N.W.2d 208 (Minn. 2016)).   "Stated differently, the 'duty' supporting a [tort] claim must arise from something other than a contract—a claim will lie only if a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself." *U.S. Bank Nat'l Ass'n v. S.A. Cash Network*, 252 F. Supp. 3d 714, 718 (D. Minn. 2017) (citation modified).   "The purpose of [the independent-duty] rule is to prevent contract claims from morphing into tort claims." *Id.* at 719.

The independent-duty rule's application to Plaintiffs' tort claims produces mixed results.   Begin with those claims that survive the rule's application.   (1) The rule does not bar Plaintiffs' breach-of-fiduciary-duty claim.   Where a fiduciary duty "exist[s], even if

arising from a contract, an alleged breach of [that] dut[y] is 'distinct from the [alleged] breach of contract.'" *S.A. Cash Network*, 252 F. Supp. 3d at 721 (last alteration in original) (quoting *Jones v. W. Union Fin. Servs., Inc.*, 513 F. Supp. 2d 1098, 1100 (D. Minn. 2007)); *accord Fairview Health Servs. v. Armed Forces Off. of the Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 917 (D. Minn. 2023); *see also Copic Ins. Co. v. Wells Fargo Bank, N.A.*, 767 F. Supp. 2d 1191, 1209–1210 (D. Colo. 2011) (applying Minnesota law and recognizing that, while a contract may create a fiduciary relationship, the common law imposes a fiduciary's duties).  It might be different in a hypothetical case where the contract imposed the same fiduciary duties as the common law, but we don't have that here.  (2) The rule does not bar Plaintiffs' negligent-misrepresentation claim.  Under Minnesota law, the duty of care with respect to this claim "arises when the person making representations is either 'supplying information for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession or employment.'" *Adams v. Rosensteel*, No. A13-0451, 2013 WL 6223562, at *3 (Minn. Ct. App. Dec. 2, 2013) (quoting *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 870 (Minn. Ct. App. 1995)).  In other words, the duty of care does not depend on the existence of a contract imposing it.  If Plaintiffs' negligent-misrepresentation theory diverges from this general rule, USBI hasn't explained how.  (3) Nor does the independent-duty rule bar Plaintiffs' statutory tort claims.  Defendants' duties under the Minnesota Consumer Fraud Act and the Minnesota Deceptive Trade Practices Act existed independently of any contractual duties.  *See TCF Nat'l Bank v. Market Intel., Inc.*, No. 11-cv-2717 (JRT/AJB), 2012 WL 3031220, at *4 (D. Minn. July 25, 2012).

Defendants were obligated to comply with these statutes even in the absence of any contractual relationship between them and Plaintiffs.

The independent-duty rule bars Plaintiffs' negligence claim. Plaintiffs allege that USBI's duty of care arose out of (1) "the agency relationship between USBI" and Plaintiffs, (2) "USBI's exercise of control and discretion over funds that belonged to its customers, related to their cash sweep balances," and (3) "the applicable industry standards." Am. Compl. ¶ 117. The first two of these sources—the agency relationship and USBI's control of Plaintiffs' funds—arose entirely out of the contractual relationship between Plaintiffs and USBI. Without the Universal Customer Agreements, there is no "agency relationship" and USBI has no "control and discretion" regarding Plaintiffs' funds. It is true that the third "industry standards" category relies on non-contractual sources to show a duty. These include a Financial Industry Regulatory Authority (or "FINRA") rule, a federal regulation, and a statute within the Internal Revenue Code. *See id.* ¶¶ 38–40, 43–58. At the hearing on Defendants' motion, however, Plaintiffs abandoned these authorities as sources of implied duties. The bottom line, then, is that the sources of a duty supporting Plaintiffs' negligence claim are just the contracts between Plaintiffs and USBI, and that means the independent-duty rule bars the claim.

B

Turn next to consider each of Plaintiffs' remaining claims *seriatim*. In Minnesota, a breach-of-fiduciary-duty claim has four elements: "[1] duty, [2] breach, [3] causation, and [4] damages." *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019). "A fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position

in terms of knowledge and authority and in whom the other party places a high level of trust and confidence." *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 330–31 (Minn. Ct. App. 2007) (citing *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)). Some relationships are fiduciary per se. "Per se fiduciary relationships include trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife." *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009). Apart from these per se fiduciary relationships, a "de facto" fiduciary relationship may arise from a particular set of facts. "Where the parties' arrangement is not of a type that has been designated a per se fiduciary relationship, the general rule in Minnesota is that it may be found to constitute a de facto fiduciary relationship only where certain 'special circumstances' are present." *Carlson, Inc. v. Int'l Bus. Machs. Corp.*, No. 10-cv-3410 (JNE/TNL), 2013 WL 6007508, at *6 (D. Minn. Nov. 13, 2013). Several considerations are relevant to determining whether such "special circumstances" exist.

> These include whether "one party place[d] its trust and confidence in the other," whether "one of the parties enjoyed superior or excessive influence over the other party," whether one party relied on the other party's "superior knowledge," whether there was "[d]isparity in business experience and invited confidence," and "whether the alleged fiduciary knew of the dependent party's ignorance" or lack of understanding regarding the at-issue transaction or transactions.

*Morton v. Park Christian Sch., Inc.*, No. 19-cv-3134 (ECT/LIB), 2022 WL 4803102, at *16 (D. Minn. Oct. 3, 2022) (quoting 4 Minn. Dist. Judges Ass'n, Minnesota Practice, Jury Instruction Guides—Civil, JIG 23.10 (6th ed. 2021)); *see Carlson, Inc.*, 2013 WL 6007508, at *6 (recognizing that special circumstances establishing a de facto fiduciary relationship

may be based on "a wide disparity of experience and knowledge between the parties, uneven access to information and resources, invited confidences, and the surrender of financial control"). Minnesota courts are reluctant "to sustain a cause of action for breach of a de facto fiduciary duty when the cause of action merely disguises another, more apposite but unavailing legal theory." *Swenson*, 764 N.W.2d at 603–04.

Plaintiffs do not plausibly allege that USBI was their fiduciary with respect to the cash-sweep program generally or the establishment of interest rates on swept cash specifically. In Minnesota, a broker-customer relationship does not ordinarily impose a fiduciary duty on the broker. *See Mehlman v. Ameriprise Fin., Inc.*, No. 24-cv-3018 (JRT/DLM), 2025 WL 2403252, at *11 (D. Minn. Aug. 19, 2025) (first citing *Corbey v. Grace*, 605 F. Supp. 247, 253 (D. Minn. 1985) ("In Minnesota, a claim for breach of fiduciary duty requires a showing of more than a simple broker-customer contract."); and then citing *Rude v. Larson*, 207 N.W.2d 709, 711 (Minn. 1973) ("Absent a special agreement to the contrary, a licensed broker owes his customer only the duty to exercise due care in executing all instructions expressly given to him by the principal. He is not a guarantor or insurer against loss sustained by his customer." (footnote omitted))); *see also DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *28–29 (S.D.N.Y. July 27, 2009) (dismissing breach of fiduciary duty claim because, under New York law, the "mere existence of a broker-customer relationship is not proof of its fiduciary character" (citation modified)). Put differently, in addition to not being among the per se fiduciary relationships recognized in Minnesota, ordinary broker-customer relationships lack the "special circumstances" that characterize a de facto fiduciary relationship under

Minnesota law.  Plaintiffs do not allege facts plausibly showing that their broker-customer relationships with USBI were out of the ordinary.

In *Mehlman*, Judge Tunheim dismissed a breach-of-fiduciary-duty claim arising out of a comparable cash-sweep program, 2025 WL 2403252, at *10–11, and in this respect his analysis is persuasive and equally applicable to this case.  Judge Tunheim reasoned that no fiduciary relationship plausibly existed between a defendant-broker and its plaintiff-customers because the defendant "disclosed that it had financial interests in the Bank Sweep Programs that diverged from Plaintiffs' interests, and a fiduciary relationship is not established 'by the plaintiff having faith and confidence in the defendant where the plaintiff should have known the defendant was representing an adverse interest.'"  *Id.* at *11 (quoting *Hope v. Klabal*, 457 F.3d 784, 791 (8th Cir. 2006)).  We have that here.  USBI disclosed its divergent financial interests.  *See, e.g.*, ECF No. 35-3 at 2 ("The rate of the fee that [USBI] receives [from U.S. Bank] can exceed the interest rate or effective yield that you receive in your balances."); *id.* at 4 (explaining that the cash-sweep program "provides financial benefits to both [USBI] and U.S. Bank"); *id.* at 7 ("[USBI] and its affiliates receive fees and benefits for services provided in connection with the Sweep Program, and may choose to make available the sweep vehicles that are more profitable to us and our affiliates than other money market funds or bank deposit accounts.").  And USBI advised Plaintiffs that it promised no specific or minimum rate of interest via the cash-sweep program.  *Id.* at 3 ("[USBI] has no obligation to ensure you receive a particular rate or the highest rate available.").

17

Plaintiffs allege that USBI's fiduciary duties with respect to the cash-sweep program arose from "the agency relationship between USBI, on one hand, and Plaintiffs and the Class on the other hand," Am. Compl. ¶ 107, but this is not convincing. It is true that, "in Minnesota, an agent owes fiduciary duties to its principal." *S.A. Cash Network*, 252 F. Supp. 3d at 721. But "an agent 'is a fiduciary with respect to matters within the scope of [the] agency.'" *State v. Campbell*, 756 N.W.2d 263, 271 (Minn. Ct. App. 2008) (quoting Restatement (Second) of Agency § 13 (A.L.I. 1958)). Here, USBI expressly disclaimed a general fiduciary duty and limited the matters within the agency's scope. In its Guide to Brokerage Recommendations: A Best Interest Disclosure, USBI explained that "when [USBI] act[s] in a brokerage capacity, you will exercise your own independent judgment in determining whether to act on our recommendations. We are not your investment adviser or fiduciary unless we have expressly agreed with you in writing to act in such a capacity." ECF No. 35-4 at 3. And the Sweep Program Disclosure Statement defined the scope of USBI's agency narrowly. It declared: "[USBI] is acting as your agent in establishing and as your custodian in holding the Deposit Accounts at U.S. Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Account, and transferring funds among the Deposit Accounts." ECF No. 35-3 at 4. The agency relationship between Plaintiffs and USBI did not extend to the establishment of interest rates in the cash-sweep program.

Plaintiffs also allege that USBI's fiduciary duties arose from its "exercise of control and discretion over funds that belonged to its customers, related to their cash sweep balances." Am. Compl. ¶ 107; *see* ECF No. 44 at 26–27 (arguing that USBI has "complete

control over its relationship with Plaintiffs"). Again, considering the extra-complaint materials, this allegation is not plausible. Cash balances in USBI's customer accounts are "automatically swept into the sweep vehicle for [an] account," and customers can "elect not to participate in the Sweep Program and/or periodically invest cash balances directly in available money market funds or other products offered as direct investments outside of the Sweep Program." ECF No. 35-3 at 2, 6. In other words, the decision to participate in the cash-sweep program was Plaintiffs'. Once they decided to participate, cash sweeps from their accounts were automatic. And USBI had no fiduciary duty to ensure a minimum interest rate on swept cash.

Plaintiffs cite one case—*O'Malley v. Boris*—in which the Supreme Court of Delaware reversed the Court of Chancery's dismissal of a breach-of-fiduciary-duty claim in the context of a cash-sweep program, 742 A.2d 845, 849 (Del. 1999), but the case is distinguishable. ECF No. 44 at 27. *O'Malley* included allegations that the brokerage firm switched a money-market sweep account to a new fund without full disclosure that the firm was benefitting from the transfer. 742 A.2d at 847, 849–50. We don't have anything like that here. Plaintiffs do not allege that USBI failed to disclose the vehicles or funds into which swept cash would be deposited. And Defendants disclosed their financial interests in the program and the conflicts those financial interests created. This case does not align with *O'Malley*. It aligns with several cases that have dismissed breach-of-fiduciary-duty claims like the claims Plaintiffs here assert. *See Mehlman*, 2025 WL 2403252, at *11; *In re LPL Fin. Cash Sweep Litig.*, 789 F. Supp. 3d 961, 986–87 (S.D. Cal. 2025) (finding that no fiduciary duty existed where "free credit balances existed in Plaintiffs' brokerage

accounts because Plaintiffs chose *not* to invest these funds and instead left them idle in their accounts," and "the specific Cash Sweep Programs at issue were governed by the terms of their account agreements and the amendments thereto" (quoting *DeBlasio*, 2009 WL 2242605, at *31)); *Dey v. Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 889–90 (N.D. Cal. 2025) (finding no fiduciary duty where banks were "not responsible for negotiating interest rates on [the customer's] behalf" and they had no "duty to offer the highest rates available or rates that are comparable to money market funds"); *DeBlasio*, 2009 WL 2242605, at *27–29; *Straily v. UBS Fin. Servs. Inc.*, No. 07-cv-00884-REB-KMT, 2009 WL 798830, at *6–8 (D. Colo. Mar. 24, 2009) (granting defendant summary judgment on fiduciary-duty claim); *see also In re Wells Fargo Cash Sweep Litig.*, No. 24-cv-4616-VC, 2025 WL 1785315, at *3 (N.D. Cal. June 27, 2025) (dismissing fiduciary duty claims by brokerage clients).[2]

If Plaintiffs plausibly alleged a fiduciary duty, they do not plausibly allege a breach. Under Minnesota law, "where the agent discloses to the principal what he intends to do and the principal acquiesces therein, there can be no claim of a breach of fiduciary relationship." *Christensen v. Redman*, 66 N.W.2d 790, 794 (Minn. 1954). Here, Plaintiffs allege that USBI breached its fiduciary duty by "allocat[ing] Plaintiffs' and the Class's cash into deposit accounts that benefited Defendants' interests above their customers'

---

[2]    Plaintiffs alleged originally that USBI's fiduciary duties derived from industry standards, including Regulation Best Interest (or "Reg. BI"), FINRA Rule 2122, and Section 4975 of the Internal Revenue Code. *See* Am. Compl. ¶¶ 38–52, 55–58. Again, Plaintiffs abandoned these contentions. They did not address these sources in their opposition brief and confirmed at the hearing that these were "not implied duties that we are intending to pursue at this time." *See* ECF No. 44 at 25–28.

interests," and by "set[ting] and pa[ying] an unreasonably low rate of interest on Plaintiffs'
and the Class's cash balances in the Bank Deposit Program."  Am. Compl. ¶ 113.

In these alleged respects, USBI told Plaintiffs what it intended to do, and Plaintiffs
acquiesced.  USBI disclosed that "[t]he rate of the fee that [USBI] receives can exceed the
interest rate or effective yield that you receive in your balances," that the program
financially benefits both USBI and U.S. Bank, and that USBI "receives fees and benefits
for services provided in connection with the Sweep Program, and may choose to make
available the sweep vehicles that are more profitable to [USBI] and [its] affiliates than
other money market funds or bank deposit accounts."  ECF No. 35-3 at 2, 4, 7.  USBI
disclosed that the "interest rate on the Deposit Accounts can be higher or lower than the
interest rates available to depositors making deposits directly with U.S. Bank or other
depository institutions in comparable accounts or for investments in money market funds
and other cash equivalent investments available through [USBI]."  *Id.* at 3.  USBI disclosed
that it "has no obligation to ensure you receive a particular rate or the highest rate
available," and USBI encouraged customers to compare the terms and rates with other
accounts and alternative investments.  *Id.*  And USBI disclosed that the sweep program
"should not be viewed as a long-term investment option," and if a customer sought "the
highest yields currently available in the market," they should discuss investment options
outside the sweep program with their investment advisor.  *Id.* at 6.[3]

---

[3]    Whether, or the extent to which, Plaintiffs' available account balances were swept
into money-market funds is not clear.  This appears to have been an available option for
both Mr. Futo and Mr. Ellis's accounts.  *See* ECF No. 35-1 at 11; ECF No. 35-2 at 26.
Regarding money-market accounts specifically, the agreements' disclosures warned that

C

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing . . . ." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (citing *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)). "[A] plaintiff alleging a claim for breach of the implied covenant of good faith and fair dealing 'need not first establish an express breach of contract claim—indeed, a claim for breach of an implied covenant of good faith and fair dealing implicitly assumes the parties did not expressly articulate the covenant allegedly breached.'" *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012) (quoting *In re Hennepin Cnty.*, 540 N.W.2d at 503).

"Minnesota courts generally look to the defendant's motive to determine whether the defendant has breached the implied covenant of good faith and fair dealing." *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 966 (D. Minn. 2007). Whether a party has acted in subjective bad faith is generally a question of fact reserved for the fact-finder, *see Anderson v. Medtronic, Inc.*, 382 N.W.2d 512, 515 (Minn. 1986), but that does not relieve a plaintiff of the burden to allege facts plausibly showing bad faith, *see Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1075 (D. Minn. 2021) ("A rule excluding fact questions from consideration on a Rule 12(b)(6) motion to dismiss would not faithfully reflect federal pleading standards.").

---

"[a]lthough money market funds seek to preserve the value of your investment at $1.00 per share, it is possible to lose money by investing in money market funds," and that risks included "the possible loss of the principal amount invested." ECF No. 35-1 at 12; *see* ECF No. 35-2 at 29.

The duty "governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th Cir. 2006). Examples of this type of conduct include:

> wrongfully repudiating a contract, avoiding performance by affirmatively blocking the happening of a condition precedent, refusing to allow a party to perform unless the performing party waived other contractual rights, and using a party's rejection of an offer as a defense to contract liability when the defendant persuaded the party to reject the offer in the first place.

*Cox*, 685 F.3d at 671 (citation modified); *see Selective Ins. Co. of S.C. v. Sela*, 413 F. Supp. 3d 861, 863 (D. Minn. 2019) (recognizing that "the implied covenant is breached when a party to the contract unjustifiably hinders the other party's performance of the contract" (citation modified)). And

> when a contract explicitly gives one party discretion over some aspect of the contracting parties' relationship, and the contract does not place any restriction or qualification on that discretion, then the implied covenant prevents the party who has the unqualified discretion from using it dishonestly, maliciously, or otherwise in subjective bad faith.

*Sela*, 413 F. Supp. 3d at 863 (citation modified).

Plaintiffs do not allege facts plausibly showing that USBI breached the covenant of good faith and fair dealing. There are three problems. First, the Amended Complaint includes no allegations tending to show that USBI acted in subjective bad faith. The pleading recognizes Plaintiffs had this burden—it alleges that the good-faith-and-fair-dealing covenant required USBI to "refrain from using its discretion as

to the operation of the Bank Deposit Program dishonestly, maliciously, or otherwise in subjective bad faith." Am. Compl. ¶ 128. But there are no allegations showing or permitting the plausible inference that USBI acted dishonestly or maliciously. *See generally id.* Second, the Amended Complaint does not allege that USBI failed to perform a contractual obligation for the purpose of thwarting Plaintiffs' rights in the sense the covenant requires—that is, no allegations show USBI acted maliciously to thwart or hinder Plaintiffs' performance under the account agreements. As best I can tell, whatever performance obligations Plaintiffs may have had are not at issue. Third, though it is true that USBI had discretion over aspects of the cash-sweep program, Plaintiffs do not allege how USBI might have exercised that discretion dishonestly or maliciously. To support this claim, Plaintiffs allege only that, "[t]hrough the implied covenant of good faith and fair dealing, USBI was obligated to pay Plaintiffs and the Class a reasonable rate of interest on cash held in the Bank Deposit Program rather than using the Program as a profit center for itself." *Id.* ¶ 129. But finding this "implied" duty would contradict the account agreements' express terms. The agreements did not promise a "reasonable" interest rate— they disclaimed the payment of any particular or minimum rate. *See* ECF No. 35-1 at 12; ECF No. 35-2 at 26, 29; ECF No. 35-3 at 3. Saying that interest rates "can vary and are impacted by several factors, including . . . market environment," ECF No. 35-3 at 3, is a truism, not a commitment to paying "market," "reasonable," or "minimum" interest rates. And the agreements disclosed USBI's financial interests in the program. *See* ECF No. 35-1 at 12; ECF No. 35-2 at 27; ECF No. 35-3 at 2.

Plaintiffs cite several cases to support their implied-covenant claim, but these cases do not justify a different outcome. For the proposition that "Minnesota courts do not uniformly require bad faith on an implied covenant claim," Plaintiffs cite *Zimmer Spine, Inc. v. Wainwright*, No. 10-cv-4725 (JNE/JSM), 2011 WL 3035133, at *5 (D. Minn. July 7, 2011), *R. & R. adopted*, 2011 WL 3035112 (D. Minn. July 25, 2011). ECF No. 44 at 14–15. *Zimmer Spine* doesn't say that. The case teaches that "[t]he substantial weight of authority is that the covenant is breached only by conduct that is dishonest, or malicious[,] or otherwise in subjective bad faith," and that, to survive a motion to dismiss, implied-covenant plaintiffs "need to allege sufficient facts which, if proven, would support an inference of bad faith." 2011 WL 3035133, at *5 (first alteration in original) (first quoting *BP Prods. N. Am.*, 534 F. Supp. 2d at 965; and then quoting *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 885 (D. Minn. 1997)).

Plaintiffs also cite several cash-sweep-program cases that allowed implied-covenant claims to survive past the motion-to-dismiss stage, but these cases are distinguishable. In *Dey*, for example, the court applied California law. 780 F. Supp. 3d at 893–95. The court did not address the subjective-bad-faith element required under Minnesota law. *See id.* And the court found no tension between the implied-covenant claim and the relevant cash-sweep agreement because the agreement required the defendant to pay interest based on "'prevailing economic and business conditions.'" *Id.* at 894. The disclosures at issue here contain no comparable commitment. They refer to "market environment" as one factor among others that "can" impact sweep-account interest rates. ECF No. 35-3 at 3. In another case Plaintiffs cite, *In re LPL Financial Cash Sweep Litigation*, the court denied a

motion to dismiss an implied-covenant claim under Massachusetts law because the relevant agreement promised that interest on swept cash would be determined by reference to "the amount the Banks are willing to pay."  789 F. Supp. 3d at 989–991.  The court read the complaint as plausibly alleging that banks would have been willing to pay more.  *Id.* at 991.  The court explained that,

> although Plaintiffs face an uphill battle—it may have been reasonable for Plaintiffs to believe that, as "the amount banks are willing to pay" increased, the interest that LPL passed along to them would increase.  But the opposite occurred.

*Id.* (footnote omitted).  Again, the agreements here cannot plausibly be understood to include a like promise.  The relevant agreements in two other cases Plaintiffs cite— *Mehlman* and *In re Wells Fargo Cash Sweep Litigation*—went even further, promising a "reasonable rate of interest" on swept cash.  *Mehlman*, 2025 WL 2403252, at *9; *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *2–3.  USBI made no comparable commitment here.

## D

Under Minnesota law, negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012) (quoting Restatement (Second) of Torts § 552 (A.L.I. 1977)).  "To succeed on a negligent misrepresentation claim, a plaintiff

must establish '(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information.'" *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 623 (8th Cir. 2017) (quoting *Williams*, 820 N.W.2d at 815).  A plaintiff may meet the claim's second element by showing that a defendant "failed to communicate information that it knew or should have discovered." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 985 (8th Cir. 2008).  "For an omission of a fact to constitute a negligent misrepresentation, 'there must first be a duty, either legal or equitable, to disclose that fact.'" *Ill. Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.*, No. 13-cv-2820 (PJS/TNL), 2014 WL 4104789, at *18 (D. Minn. Aug. 19, 2014) (quoting *Hurley v. TCF Banking & Sav., F.A.*, 414 N.W.2d 584, 587 (Minn. Ct. App. 1987)).  The duty to disclose arises if "1) there existed a fiduciary or confidential relationship between the parties; 2) one party was in possession of special facts that could not have been discovered by the other; or 3) one party who chooses to speak omits information so as to make the information actually disclosed misleading." *Sailors v. N. States Power Co.*, Civ. No. 4-92-253, 1992 WL 532172, at *9 (D. Minn. July 13, 1992) (citing *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 622 (Minn. 1972)); *see White v. Premier Bank*, No. A18-1200, 2019 WL 2262768, at *2 (Minn. Ct. App. May 28, 2019) (citing *Klein*).

Plaintiffs' negligent-misrepresentation theories are not plausible.  Plaintiffs' first theory is that USBI supplied false information by failing to disclose that interest rates paid on swept cash "were determined by a drive to boost income for Defendants at the expense

of customers." Am. Compl. ¶ 86. It is difficult to understand how this allegedly omitted statement—that profit-maximization motivated USBI in determining interest rates—would not be true of every profit-seeking organization. If that is so, then disclosure would have been unnecessary for the simple reason that any reasonable customer would (or should reasonably be expected to) have known the fact. That aside, the account agreements and related documents disclosed the functional equivalent of this information. Again, these documents made clear that USBI did not promise a "reasonable" interest rate—they disclaimed the payment of any particular or minimum rate. *See* ECF No. 35-1 at 12; ECF No. 35-2 at 26, 29; ECF No. 35-3 at 3. And the agreements disclosed USBI's financial interests in the program in multiple ways. *See* ECF No. 35-1 at 12; ECF No. 35-2 at 27; ECF No. 35-3 at 2.

Plaintiffs' second negligent-misrepresentation theory is that USBI supplied false information by "fail[ing] to disclose the interest rates" the cash-sweep program offered, "instead only directing customers to a website." Am. Compl. ¶ 87. There is nothing inherently false or misleading about directing a customer to a website for specific information. And there is nothing misleading about the language USBI used to refer its customers to this resource. The Sweep Program Disclosure Statement included the following:

> You may contact your Wealth Management Advisor, Wealth Management Brokerage Services or access our web site at www.usbank.com/usbi/rates to determine the current interest rates on the Deposit Accounts and other sweep investments we offer. Interest rates can change daily and will be available on the business day the rates are set.

ECF No. 35-3 at 3.  These directions are reasonably clear, and Plaintiffs cite no authority for the proposition that referring customers in this way to a website or other similar source for information is plausibly false or misleading.

E

Plaintiffs' Minnesota statutory claims under the Consumer Fraud Act, Minn. Stat. § 325F.69, and the Deceptive Trade Practices Act, Minn. Stat. § 325D.44, may be analyzed together.  Plaintiffs' core factual allegation supporting each claim is identical—they allege Defendants violated each statute by misrepresenting "that customers would be provided reasonable, market-based interest rates."  ECF No. 44 at 18; *id.* at 20; *see* Am. Compl. ¶¶ 145, 149 (alleging that Defendants violated these statutes by "making material misrepresentations and omissions regarding the Program").  Both statutes create liability based on false or misleading statements or omissions in particular contexts.  *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014) (recognizing that, under the Consumer Fraud Act, "a party may be liable . . . either by making an affirmative statement that is false or by concealing or not disclosing facts under certain circumstances"); *Gardner v. First Am. Title Ins. Co.*, No. 01-cv-937 (PAM/SRN), 2001 WL 1690053, at *3 (D. Minn. Dec. 10, 2001) (recognizing that "omissions are actionable under the [Deceptive Trade Practices Act]").  But as discussed earlier, Plaintiffs' core allegation that Defendants promised "reasonable, market-based interest rates" is not plausible when evaluated against Plaintiffs' account agreements and the accompanying disclosure documents.  For this same reason, Plaintiffs' statutory claims are dismissal-worthy.

29

F

To state an unjust enrichment claim, Plaintiffs must allege Defendants "knowingly received or obtained something of value for which [they] in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (citation modified); *see Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195–96 (Minn. Ct. App. 2007). As an equitable remedy, unjust enrichment "does not apply when there is an enforceable contract" governing the parties' relationship. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012), *superseded by statute on other grounds as recognized in Hall v. City of Plainview*, 954 N.W.2d 254, 271 (Minn. 2021); *see U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981). Unjust enrichment "rest[s] on notions of justice and fairness rather than on any actual agreement between the parties." *O'Brien & Wolf, LLP v. S. Cent. Minn. Elec. Workers' Fam. Health Plan*, 923 N.W.2d 310, 316 (Minn. Ct. App. 2018). The alternative pleading of unjust enrichment and breach of contract "is inappropriate in situations . . . where the complaint sets forth no plausible basis to invoke unjust enrichment because there is no dispute that the [contract] is valid and that the conduct complained of is explicitly covered by that express contract." *Strategic Imp. Supply, LLC v. Meyers*, No. 22-cv-1699 (PJS/DJF), 2022 WL 16718673, at *2 (D. Minn. Nov. 4, 2022) (quoting *Baumgardner v. Bimbo Food Bakeries Distrib., Inc.*, 697 F. Supp. 2d 801, 816 (N.D. Ohio 2010)).

Judged against these rules, Plaintiffs' unjust-enrichment claim is not plausible. Plaintiffs' unjust-enrichment theory is that "Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits," and "Defendants were

unjustly enriched because, among other benefits, they received significantly greater net interest income than they would have but for their wrongful conduct." Am. Compl. ¶¶ 153–54. The Amended Complaint alleges no facts disputing the account agreements' validity, and the complained-of conduct is governed by the agreements in the sense that the agreements did not require the payment of a reasonable minimum interest rate or limit the extent to which Defendants might profit from the program.

V

The final issue is whether the dismissal should be with prejudice or whether Plaintiffs should be given the opportunity to amend the Amended Complaint. A federal court has discretion to decide between a with-prejudice and without-prejudice dismissal. *See Paisley Park Enters. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019). A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, *Milliman v. County of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sep. 26, 2013); *see Reinholdson v. Minnesota*, 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting R. & R.), or when the record makes clear that any amendment would be futile, *see Paisley Park*, 361 F. Supp. 3d at 880 n.7. On the other hand, when a plaintiff's claim "might conceivably be repleaded with success," dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *R. & R. adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

Here, for legal and practical reasons, the better answer is to dismiss the Amended Complaint with prejudice.  As a legal matter, amendment would seem impracticable because the justifications for granting Defendants' motion came largely from the extra-complaint materials Plaintiffs relied on to support their claims.  It is difficult to hypothesize how amendment might change those aspects of the decision.  From a practical perspective, the case's procedural history gives no reason to think that Plaintiffs might realistically be able to amend to address the dismissal-prompting problems identified here.  In response to Defendants' Rule 12(b)(6) motion, Plaintiffs stood on the factual, merits-directed allegations of their original Complaint.  (Remember, the amendment addressed only the CAFA issue.)  Though Plaintiffs requested leave to amend in their opposition brief "[t]o the extent the Court finds the Complaint in any way inadequate," this request appeared in a footnote and included no description of additional facts (or categories of facts) Plaintiffs might add to support their claims.  *See* ECF No. 44 at 32 n.14; *see* D. Minn. LR 15.1(b).  For these reasons, Plaintiffs will not be given the opportunity to amend, and the dismissal will be with prejudice.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    The Motion to Dismiss [ECF No. 32] of Defendants U.S. Bancorp and U.S. Bancorp Investments, Inc. is **GRANTED**.

2.    The Amended Complaint [ECF No. 52] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 30, 2026                                  s/ Eric C. Tostrud
                                                                      Eric C. Tostrud
                                                                      United States District Court